UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SADEQ A. MOHSSEN,

                    Plaintiff,           Civil Action No. 12-14501
                                    Honorable Nancy G. Edmunds
                                    Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 13]**

Plaintiff Sadeq A. Mohssen ("Mohssen") brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [11, 13], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.     RECOMMENDATION**

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Mohssen is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [13] be GRANTED, Mohssen's Motion for Summary Judgment [11] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision be AFFIRMED.

## II.    REPORT

### A.    Procedural History

On October 20, 2009, Mohssen filed an application for DIB, alleging a disability onset date of June 29, 2009.  (Tr. 164-66).  This application was denied initially on January 13, 2010.  (Tr. 68-72).  Mohssen filed a timely request for an administrative hearing, which was held on June 3, 2011, before ALJ Oksana Xenos.  (Tr. 45-66).  Mohssen, who was represented by attorney Andrea Hamm, testified at the hearing, as did vocational expert ("VE") Dr. Vanessa Harris.  (*Id.*).  On June 24, 2011, the ALJ issued a written decision finding that Roberts is not disabled.  (Tr. 31-40).  On August 30, 2012, the Appeals Council denied review.  (Tr. 1-5).  Mohssen filed for judicial review of the final decision on October 11, 2012.  (Doc. #1).

### B.    Background

#### 1.    Disability Reports

In an undated disability report, Mohssen indicated that he completed high school (in Yemen) but had no further education.  (Tr. 192).  He cannot speak or understand English (his preferred language is Arabic).  (Tr. 187).  He also indicated, however, that he can read and understand written English, and can write more than his name in English.  (Tr. 188).  Prior to stopping work, Mohssen worked as a crane/machine operator (from October 2000 through January 2007) and as a valet driver/cashier (from January 2000 through June 29, 2009).  (Tr. 189).

Mohssen indicated that his ability to work is limited by constant pain in his right leg, depression, psychotic problems, and "limited english/reading/writing."  (*Id.*).  When describing how these conditions limit his ability to work, Mohssen stated:

> [U]nable to do certain things for long periods of time due to pain in leg such as walking, sitting, standing, climbing stairs, lack of sleep due to pain, problems because of the cold/raining or cloudy ….

2

(*Id.*).  Mohssen reported that these conditions first interfered with his ability to work on January 28, 2007.  (*Id.*).  He continued working after that date, but his job changed and he "worked with restrictions" for some period of time.  (*Id.*).  Eventually, beginning on June 29, 2009, Mohssen's conditions prevented him from working.  (*Id.*).

In a function report dated November 15, 2009, Mohssen reported that he lives in a house with his family.  (Tr. 202).  On a typical day, he visits with friends and family, takes a walk, goes shopping, surfs the internet, goes to the mosque (two or three times a day), and watches sports or a movie on television.  (*Id.*).  He cares for his nephews and has no problem with personal care. (Tr. 203).  Mohssen is able to prepare his own meals and do some household chores, including cleaning and laundry.  (Tr. 204-05).  He is able to drive, go shopping, pay bills, and handle a savings and checking account.  (Tr. 205).

When asked to identify functions impacted by his condition, Mohssen checked lifting, bending, standing, walking, sitting, kneeling, and stair climbing.  (Tr. 207).  Mohssen further indicated that he cannot do anything that "requires lifting, standing, or sitting for long hours" and cannot walk for a "long distance."  (*Id.*).  He is able to follow written and spoken instructions, and he gets along well with authority figures.  (Tr. 199-200).

### 2.  *Mohssen's Testimony*

At the time of June 3, 2011 hearing before the ALJ, Mohssen was 39 years old.  (Tr. 48). He testified (through an interpreter) that he completed high school in Yemen and came to the United States in September of 2000.  (Tr. 49).  He lives in a house with his sister, brother, and father.  (*Id.*).  He is married with four children, but his wife and children still live in Yemen. (*Id.*).  He last saw them in October of 2010, when he made a three-month trip to that country. (Tr. 49-50).

3

When asked why he believes he is disabled, Mohssen testified that he broke his leg while working as a valet in 2007. (Tr. 51, 55). He had surgery to repair the leg, but he continues to experience pain and difficulty sleeping. (*Id.*). Since his injury, his employer has allowed him to perform some work as a cashier, but it is difficult for him to do this job – especially on hot and cold days – because he cannot sit for eight hours. (Tr. 53, 56). In addition, he claims he has difficulty interacting with customers because of his limited English. (Tr. 56).

Mohssen testified that he prays five times a day. (Tr. 54). With his family's help, he is able to cook, and he watches movies and surfs the internet. (*Id.*). Three or four days a week, he takes naps during the afternoon because he is constantly tired. (Tr. 54, 56). He takes Vicodin and also uses Voltaren gel for pain, but these medications cause dizziness and "shaking." (Tr. 57). He testified that he can sit for 30 minutes, stand for 20-25 minutes, walk 1/2 mile, and carry 10-12 pounds. (Tr. 58-59).

### 3. *Medical Evidence*

#### (a) *Treating Sources*

##### (1) *Dr. Alfred Faulkner*

On January 28, 2007, Mohssen was involved in a motor vehicle accident and sustained a right femur fracture. (Tr. 273). He underwent urgent right femoral shaft intramedullary nailing using a reconstruction type nail. (Tr. 275).

After his surgery, Mohssen treated with Dr. Alfred Faulkner at Michigan Orthopedic Specialists. Initially, Dr. Faulkner kept Mohssen off work until approximately May 27, 2007. (Tr. 271, 277). On May 25, 2007, Dr. Faulkner issued restrictions indicating that Mohssen could return to work but, for eight weeks, should perform a sit down job only. (Tr. 270). However, on June 1, 2007, Mohssen underwent additional surgery to remove a distal femoral locking screw

4

from his right femur after Dr. Faulkner diagnosed delayed union, right femoral shaft. (Tr. 269). Following that surgery, Dr. Faulkner kept Mohssen off work until approximately August 24, 2007. (Tr. 267). On that date, Dr. Faulkner cleared Mohssen to return to work with the following restrictions: no lifting more than ten pounds, and ten-minute breaks after standing or walking for more than two hours. (Tr. 266). It appears that these restrictions continued for several months. (Tr. 262-65). However, by March 21, 2008, Mohssen's only restriction was that he be permitted to take intermittent 15-minute breaks, three times a day. (Tr. 261).

On November 9, 2009, Mohssen returned to see Dr. Faulkner, who noted that he had not been seen in the clinic since March of 2008. (Tr. 259). Mohssen complained of pain in his femur, radiating down to his thigh, and difficulty walking. (*Id.*). He denied tingling or numbness and indicated that the pain did not radiate down past his knee. (*Id.*). On physical examination, Mohssen's circulation and sensation were intact, and he had full range of motion and full internal and external rotation of the hip. (*Id.*). X-rays showed a healed femoral shaft fracture with interval recon nail placement. (*Id.*). Dr. Faulkner referred Mohssen for pain management, indicating that he had "no idea why [Mohssen] is still in pain." (*Id.*).

### (2)    *Dr. Razmig Haladjian*

On November 12, 2010, Mohssen saw Dr. Razmig Haladjian at the Michigan Institute of Pain Management. (Tr. 305). At that visit, Mohssen complained of ongoing pain in his "right lower extremity." (*Id.*). He described the pain as intermittent and a "deep ache" that increased with activity and cold weather. (Tr. 308). On examination, pain behavior was absent. (*Id.*). Mohssen's gait was normal and steady and his motor strength was 5/5 bilaterally throughout. (*Id.*). Dr. Haladjian noted that Mohssen would benefit from right hip bursa injections and continued his pain medication. (Tr. 309).

Mohssen returned to see Dr. Haladjian on December 10, 2010, and indicated that he was taking Vicodin as needed for pain and "doing fairly well with this." (Tr. 310). He also was using Voltaren gel for pain and "getting good pain relief." (*Id.*). On examination, pain behavior was again absent, motor strength was 5/5 bilaterally throughout, deep tendon reflexes were 2+ bilaterally throughout, and sensation was intact to light touch and pressure. (Tr. 311).

On February 4, 2011, Dr. Haladjian wrote a letter indicating that Mohssen was under his care for "chronic, disabling hip pain secondary to a fracture he sustained." (Tr. 315). He further indicated that Mohssen was "having significant disability from it and he is unable to work because of the pain." (*Id.*). His course of treatment continued to involve injections, as well as medication (Ultram and Voltaren gel), which was expected to continue for an undetermined amount of time. (Tr. 314-15).

*(3) Dr. Raad Al-Saraf*

On May 26, 2011, Claimant's primary care physician, Dr. Raad Al-Saraf, opined that Mohssen suffered from non-insulin-dependent diabetes mellitus, hyperlipidemia, Vitamin D deficiency, and history of fracture of right femur causing chronic leg pain. (Tr. 329). Dr. Al-Saraf further noted that Mohssen was using medications on a daily basis and needed regular follow-up evaluation and blood tests. (*Id.*).[1]

*(b) Non-Treating Sources*

On January 13, 2010, a physical residual functional capacity ("RFC") assessment was completed. (Tr. 297-304). Dr. Muhammad Khalid, a state agency medical consultant, examined Mohssen's medical records and concluded that he retains the ability to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for 6 hours in an 8-hour workday, and sit for

[1] As the ALJ noted, the record also contains four pages of Dr. Al-Saraf's treatment notes, which are "largely illegible." (Tr. 36 (citing Tr. 279-82)).

6 hours in an 8-hour workday.  (Tr. 298).  Dr. Khalid further concluded that Mohssen can never climb ladders, ropes, or scaffolds, and can only occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl.  (Tr. 299).

On March 10, 2011, a functional capacity evaluation was completed by Michael Feger, PTA.  (Tr. 319-27).  At that evaluation, Mohssen reported that he was able to drive "for the most part pain free."  (Tr. 320).  He also reported that he slept a full eight hours at night and had no difficulties dressing himself.  (*Id.*).  He claimed that he had right lower extremity pain with prolonged walking, standing, stair climbing, and sitting.  (*Id.*).  On physical examination, he appeared to ambulate with equal weight bearing on both lower extremities, and he used no assistive device.  (Tr. 321).  His right lower extremity strength was 4+/5.  (*Id.*).  On the treadmill assessment, Mohssen had increased gait deviation and fatigue with perceived observation, but he scored 21/24 on gait assessment.  (Tr. 322-23).  When lifting weights from floor to waist level, Mohssen complained of pain but did not show any physical signs of pain.  (Tr. 323).  He was able to push 25 pounds and pull 20 pounds, complaining of only a minor increase in pain, but using proper body mechanics.  (Tr. 325).  Mr. Feger observed that Mohssen "complained of pain with moving of right lower extremity but failed to complain of pain or exhibit guarding during supine ROM measurements of lower extremities."  (Tr. 327).  In addition, although Mohssen complained of increased pain with prolonged sitting, he "was able to sit for periods of the evaluation, seemingly pain free."  (*Id.*).  And, although he stated that he had pain during the sit-to-stand activity (testing hip flexors), when asked to perform a seated cycling activity, he was able to do so pain-free.  (*Id.*).  In conclusion, Mr. Feger indicated that Mohssen would benefit from a stretching program to decrease any tightness in his lower extremity musculature.  (*Id.*).

7

### 4.    *Vocational Expert's Testimony*

Dr. Vanessa Harris testified as an independent vocational expert ("VE") at the hearing before the ALJ.  (Tr. 61-65).  The ALJ asked the VE to imagine a claimant of Mohssen's age, education, and work experience, who can perform light work, but is limited to unskilled routine work that can be learned through simple visual demonstration; no climbing of ladders, ropes, or scaffolds; only occasional climbing of stairs, balancing, stooping, kneeling, and crawling; no temperature extremes; and a sit/stand option.  (Tr. 62-64).  The VE testified that the hypothetical individual could not perform Mohssen's past relevant work as a cashier or valet.  (Tr. 63).  However, the VE testified that the hypothetical individual would be capable of working as a binder (20,000 jobs in the state of Michigan), garment sorter (19,000 jobs), and box sealing inspector (20,000 jobs).  (Tr. 63-64).

### C.    Framework for Disability Determinations

Under the Act, DIB are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months,

8

and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**D.    The ALJ's Findings**

Utilizing the five-step sequential analysis, the ALJ found that Mohssen has not been disabled under the Act since June 29, 2009, the alleged onset date.  At Step One, the ALJ found that Mohssen had worked at substantial gainful activity levels for at least a few months after his alleged onset date; however, she did not analyze this issue in detail or rely on it in reaching her ultimate decision, declaring it moot in light of her finding, under the remaining steps of the sequential analysis, that Mohssen is not disabled.  (Tr. 33).  At Step Two, the ALJ found that Mohssen has the severe impairment of "right leg injury."[2]  (Tr. 34).  At Step Three, the ALJ found that Mohssen's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (*Id.*).

The ALJ then assessed Mohssen's residual functional capacity ("RFC"), concluding that

---

[2] The ALJ also found that Mohssen's alleged depression was non-severe.  (Tr. 34).  Mohssen does not challenge this conclusion.  The issue is therefore waived.  *See Martinez v. Comm'r of Soc. Sec.*, 2011 WL 1233479, at *2 (E.D. Mich. Mar. 30, 2011).

he is capable of performing light work, except that it must be unskilled, routine work that can be learned through simple visual demonstration; no climbing of ladders, ropes, or scaffolds; only occasional climbing of stairs, balancing, stooping, kneeling, crouching, and crawling; no temperature extremes; and with a sit/stand option.  (Tr. 34-38).

At Step Four, the ALJ determined that Mohssen is unable to perform his past relevant work.  (Tr. 38-39).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Mohssen is capable of performing a significant number of jobs that exist in the national economy.  (Tr. 39-40).  As a result, the ALJ concluded that Mohssen is not disabled under the Act.  (Tr. 40).

### E.   Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's

decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Secy' of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

In his motion for summary judgment, Mohssen argues that the ALJ erred in: (1) failing to account for his difficulty with the English language; (2) failing to re-contact Dr. Al-Saraf after finding his treatment notes "largely illegible"; and (3) improperly discounting the "opinions" of Dr. Haladjian and Dr. Faulkner. Each of these arguments will be addressed in turn.

       1.    *The ALJ Reasonably Accounted for*
                  *Mohssen's Difficulty with the English Language*

In a disability report, when asked whether he could "speak and understand English," Mohssen answered "No."[3]  (Tr. 187).  Although he testified through an interpreter at the hearing, Mohssen came to the United States from Yemen in September of 2000 (nearly eleven years earlier).  (Tr. 49).  He also indicated that he had worked in the United States for years as a valet (which he continued to do on a part-time basis at the time of the hearing), cashier, and crane operator.  (Tr. 50-51, 189).

Pursuant to 20 C.F.R. §404.1564, a claimant's education – including his ability to communicate in English – must be considered when evaluating his or her ability to meet vocational requirements.  Specifically, the regulations provide, in relevant part:

> Inability to communicate in English.  Since the ability to speak, read and understand English is generally learned or increased at school, we may consider this an educational factor.  Because English is the dominant language of the country, it may be difficult for someone who doesn't speak and understand English to do a job, regardless of the amount of education the person may have in another language.  Therefore, we consider a person's ability to communicate in English when we evaluate what work, if any, he or she can do.  It generally doesn't matter what other language a person may be fluent in.

20 C.F.R. §404.1564(b)(5).  Mohssen argues that the ALJ erred in failing to adequately consider his ability to communicate in English in formulating her RFC assessment and in posing hypothetical questions to the VE.  (Doc. #11 at 9-10).

In this case, the ALJ found that Mohssen had a limited ability to communicate in English.  (Tr. 39).  She accounted for Mohssen's language difficulties by limiting him to unskilled work[4]

---

[3] However, on the report's very next page, Mohssen answered in the affirmative when asked whether he could "read and understand English" and whether he could write more than his name in English.  (Tr. 188).

[4] With respect to unskilled work, the regulations provide that "[w]hile illiteracy or the inability to

that can be learned through simple visual demonstration.  (Tr. 34).  Mohssen acknowledged this

limitation in his motion for summary judgment (Doc. #11 at 9), but then baldly asserted in his

reply brief that, "Defendant suggests that this limitation adequately accounts for plaintiff's

language problems, but this is obviously not so." (Doc. #14 at 5).  Mohssen does not, however,

cite any case law or regulatory authority for this "obvious" proposition.  And, indeed, courts

have upheld RFC findings where – to account for language difficulties – claimants are restricted

to unskilled work that can be learned through visual demonstration.  *See, e.g., Meza v. Astrue*,

2011 WL 11499, at *20 (N.D. Cal. Jan. 4, 2011) (limitation of claimant to simple one- and two-

step jobs that could be performed following a brief demonstration adequately accounted for

claimant's limited English); *Alvarez v. Astrue*, 2012 WL 3441904, at *15 (D. Kan. Aug. 14,

2012) (limitation of claimant to unskilled work with instructions "by demonstration" to account

for claimant's limited ability to speak English was sufficient); *Troncoso v. Astrue*, 2012 WL

441753, at *6 (D. Mass. Feb. 9, 2012) (limitation of claimant to unskilled work sufficiently

accounted for claimant's lack of English proficiency because the unskilled jobs identified by the

VE consisted of "routine, repetitive tasks that are learned by demonstration").[5]

Similarly, Mohssen argues that limiting him to unskilled work that can be learned by

simple visual demonstration is insufficient because, "[a]t the least, there needed to be

communicate in English may significantly limit an individual's vocational scope, the primary
work functions in the bulk of unskilled work relate to working with things (rather than with data
or people) and in these work functions at the unskilled level, *literacy or ability to communicate
in English has the least significance*." 20 C.F.R. Pt. 404, Subpt. P, Appx. 2, §201.00(i)
(emphasis added).

[5] The Court could certainly envision a situation in which it would be difficult to discern whether
a similar limitation was intended to account for a claimant's language difficulties, or limitations
in concentration, persistence, or pace caused by a mental impairment.  In this case, however, the
ALJ found that Mohssen does not suffer from a severe mental impairment (and Mohssen has not
challenged that finding).  Thus, there is no indication in this record that the ALJ's limitation of
Mohssen to "unskilled, routine work that can be learned through simple visual demonstration"
was imposed for any reason other than to account for Mohssen's language difficulties.

13

consideration of whether communication with co-workers, supervisors, or the general public would also be required." (Doc. #14 at 5). Again, however, Mohssen cites no authority for this proposition, and as the cases cited above make clear, no such restrictions are necessary to adequately account for a claimant's difficulty with the English language. *See Meza*, *supra* at *20; *Alvarez, supra* at *15; *Troncoso*, *supra* at *6. In this case, there is no evidence that Mohssen's alleged difficulty communicating with others would completely preclude unskilled work or be an absolute bar on working with others or the public. That is particularly true where, as here, Mohssen's past work – including the valet/cashier work that he was performing on a part-time basis at the time of the hearing – admittedly involved some interaction and communication with others. (Tr. 52-53).

Mohssen also faults the ALJ because, aside from limiting him to unskilled work that can be learned through simple visual demonstration, the ALJ did not specifically reference his language difficulties in formulating his hypothetical questions to the VE. (Doc. #11 at 9). While it is true that the ALJ did not explicitly state in his hypothetical questions that Mohssen has a limited ability to communicate in English, this did not result in any reversible error; the VE was present at the hearing and had the opportunity to observe that Mohssen testified through an interpreter. Thus, considering that the purpose of developing a hypothetical claimant is to mirror the claimant's capabilities and limitations, the questions posed to the VE (which included a limitation to unskilled work that could be learned by visual demonstration) in connection with Mohssen's hearing testimony, make clear that the hypothetical individual representing Mohssen had difficulties communicating in English.

Moreover, Mohssen was represented at the hearing by an attorney, who was given the opportunity to question the VE. (Tr. 65). If Mohssen's counsel had any doubt whether the

hypothetical posed to the VE included Mohssen's limited English skills, or whether Mohssen had

the English literacy to perform the jobs identified, his attorney could have asked the VE.  But,

Mohssen's counsel chose not to cross-examine the VE.  (Tr. 65).  Accordingly, the ALJ

reasonably accepted the uncontroverted testimony of the VE (Tr. 39-40), and her determination

that Mohssen can perform a significant number of jobs that exist in the national economy is

supported by substantial evidence.

### 2.  *The ALJ Was Not Required to Re-Contact Dr. Al-Saraf*

As noted above, the record contains four pages of handwritten treatment notes from Dr.

Raad Al-Saraf, Mohssen's primary care physician.  (Tr. 279-82).  The ALJ reviewed these

records and stated:  "Progress notes from Raad Al-Saraf, M.D., dated December 24, 2008, to

November 16, 2009, are largely illegible and of limited probative value (Exhibit 2F)."  (Tr. 36).

Mohssen asserts that the ALJ erred in simply dismissing these treatment notes as illegible,

arguing that she had a duty to re-contact Dr. Al-Saraf.  (Doc. #11 at 10-11).

Social Security Ruling ("SSR") 96-5p provides as follows:

> Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

SSR 96-5p, 1996 WL 374183, at *6 (July 2, 1996).  In other words, ALJs are required to re-

contact treating physicians who provide opinions on the issue of disability when two criteria are

met:  (1) "the evidence does not support a treating source's opinion," and (2) "the adjudicator

cannot ascertain the basis of the opinion from the record."  *Ferguson v. Comm'r of Soc. Sec.*, 628

F.3d 269, 273 (6th Cir. 2010) (quoting SSR 96-5p, 1996 WL 374183, at *6).  Mohssen has not

satisfied these criteria.

15

As an initial matter, although Mohssen argues that the ALJ should have re-contacted Dr. Al-Saraf "to determine his opinion with more clarity,"[6] (Doc. #11 at 10), it is clear that the records at issue are not an "opinion" and, thus, the requirements of SSR 96-5p are not triggered. The four pages of handwritten notes deemed "largely illegible" by the ALJ do not reflect an *opinion* of Dr. Al-Saraf.  (Tr. 279-82).   Rather, they appear to contain basic clinical findings (Mohssen's weight, blood pressure, pulse, temperature) and his subjective complaints (ranging from a runny nose to hip and thigh pain), not an opinion on Mohssen's functional limitations. (*Id.*).  SSR 96-5p specifically defines "medical opinions" as "statements from physicians … that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."   SSR 96-5p, 1996 WL 374183, at *2 (internal quotations omitted). Moreover, courts have specifically drawn a distinction between a doctor's notes for purposes of treatment and a doctor's ultimate opinion on an individual's ability to work.  *See, e.g., Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 356 (3d Cir. 2008).   Thus, the four handwritten pages of treatment notes at issue do not constitute a "medical opinion" and they do not trigger a duty to re-contact Dr. Al-Saraf.

Moreover, the ALJ discussed Dr. Al-Saraf's May 26, 2011 letter, which appears to summarize his treatment of Mohssen.  (Tr. 37).  With respect to this document, the ALJ said:

---

[6] In support of this argument, Mohssen cites *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001), and *Miller v. Heckler*, 756 F.2d 679, 680-81 (8th Cir. 1985).  Both of these cases are inapposite.  *Tonapetyan* did not involve a situation where some (or all) of the medical records were illegible.  And, on the opposite end of the spectrum, the record in *Miller* contained nearly ten years of handwritten entries from the plaintiff's treating physician which were "in large part illegible."  *Id.* at 680.  In that case, given how crucial those records were to the plaintiff's claim, remand was warranted for clarification and supplementation.  *Id.* at 681.  In the case at hand, however, at issue are only *four pages* of treatment notes, and, as discussed below, the record also contains a typewritten summary of Dr. Al-Saraf's findings.

> On May 26, 2011, Raad Al-Saraf, M.D., noted the claimant suffers from non-insulin-dependent diabetes mellitus; hyperlipidemia; Vitamin D deficiency; and history of fracture of right femur causing chronic leg pain. He noted the claimant was using medications on a daily basis and needed regular follow-up evaluation and blood tests (Exhibit 10F).

(*Id.*).  Thus, the ALJ did not merely "throw up his hands" and ignore Dr. Al-Saraf's records. Rather, the ALJ explicitly considered Dr. Al-Saraf's summary statement (which more closely approximates a "medical opinion" than do the four handwritten pages at issue) and did not dispute or disregard his findings.

In summary, Mohssen has not established (1) that Dr. Al-Saraf issued a "medical opinion"; (2) that the evidence failed to support such an opinion; or (3) that the ALJ was unable to ascertain the basis of any such opinion from the record.  *See Ferguson*, 628 F.3d at 273.  Thus, the ALJ had no duty to re-contact Dr. Al-Saraf.  *See Anderson v. Astrue*, 2012 WL 4867703, at *13 (E.D. Mich. Sept. 18, 2012) (no obligation to re-contact plaintiff's treating physicians, even though "a majority of all the treating physician records were allegedly illegible").

### 3.    The ALJ Properly Considered the Opinions of Dr. Haladjian and Dr. Faulkner

Mohssen also argues that the ALJ erred in failing to properly consider the opinions of two of his treating physicians, Dr. Haladjian and Dr. Faulkner.  (Doc. #11 at 11-12).  As set forth below, the Court finds no merit to these arguments.

### a.    Dr. Haladjian

The record contains a statement from Dr. Razmig Haladjian, dated February 4, 2011, in which he states:

> Sadeq Mohssen is under my care for chronic, disabling hip pain secondary to a fracture he sustained.  He is having significant disability from it and he is unable to work because of the pain.  His course of treatment involves injections, as well as medication, and will continue for an undetermined amount of time.

17

(Tr. 315).  The ALJ considered Dr. Haladjian's statement but gave "little weight" to his "opinion as to whether the claimant has a disability," noting that the question of whether an individual is disabled under the Act is an issue reserved to the Commissioner.  (Tr. 36 (citing 20 C.F.R. §§404.1527(e) and 416.927(e)).  Mohssen does not challenge the ALJ's decision in this respect, and, indeed, it was proper.  *See* SSR 96-5p, 1996 WL 374183, at *2 ("[T]reating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance.").

Instead, Mohssen argues that Dr. Haladjian "offered more than merely a conclusion of disability," and the ALJ ignored the remainder of his records, which reflected the "the nature of [his] condition" and "the sort of treatment necessary to address it."  (Doc. #11 at 12).  This is incorrect.  The ALJ properly summarized and considered Dr. Haladjian's treatment notes.  For example, the ALJ noted that, on November 12, 2010, Dr. Haladjian examined Mohssen and determined that he would benefit from pain management injections and medications.  (Tr. 36).  The ALJ also noted that Mohssen returned to see Dr. Haladjian on December 10, 2010, indicating that he was "getting good relief" of his symptoms with a combination of Vicodin and Voltaren gel.  (*Id.*).  Thus, the ALJ summarized Dr. Haladjian's treatment notes and, to the extent these notes reflect limitations stemming from Mohssen's leg condition, the ALJ properly found that this injury was a severe physical impairment.  (Tr. 34).  Moreover, the ALJ accounted for the limitations noted by Dr. Haladjian by restricting Mohssen to light work that involved no climbing of ladders, ropes, or scaffolds; required only occasional climbing of stairs, balancing, stooping, kneeling, crouching, and crawling; and provided a sit/stand option.  (*Id.*).  In summary, Mohssen has failed to demonstrate that the ALJ ignored Dr. Haladjian's treatment notes or that these notes undermine the ALJ's RFC assessment.

18

b.     Dr. Faulkner

Mohssen also argues that although the ALJ "discussed the opinions of Dr. Faulkner in general," she "failed to acknowledge the restrictions he would have imposed."  (Doc. #11 at 12). Specifically, the record contains a noted dated March 21, 2008, which indicates that Mohssen could only work with intermittent 15-minute breaks, three times a day.  (Tr. 261).  According to Mohssen, because Dr. Faulkner was a treating physician, his opinion in this respect should have been given significant, if not controlling weight.  (Doc. #11 at 12).

Mohssen is correct that an ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'"  *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (internal quotations omitted).  However, while treating source opinions are entitled to controlling weight under these circumstances, it is "error to give an opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole.  SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("Treating physicians' opinions are only given such deference when supported by objective medical evidence.").

Mohssen is correct that, although the ALJ referred to the restrictions imposed by Dr. Faulkner in March of 2008 (Tr. 35), she did not explicitly state what weight she was giving this opinion.  However, Mohssen's argument that this omission constitutes reversible error is without merit.  Dr. Faulkner issued these restrictions more than one year before Mohssen allegedly became disabled.  Courts have held that an ALJ's failure to mention a treating physician's opinion, which was based on the claimant's condition before the alleged onset date, is harmless

19

error.  *See Heston*, 245 F.3d at 535.  There is no indication in the record of how long Dr. Faulkner intended this restriction to last.  And, as the *Heston* court recognized, a claimant's past medical history should not be given more weight than observations of a doctor observing the claimant during the relevant period of disability.  *Id.*  Here, where the ALJ specifically considered and gave "great weight" to Dr. Faulkner's November 2009 conclusions, her failure to assign weight to the restrictions he imposed in March 2008 does not constitute reversible error.[7]

In sum, the Court finds that the ALJ properly considered the medical evidence of record and appropriately accounted for Mohssen's difficulty with the English language in formulating her RFC.  Further, based on a review of the entire record, the Court finds that the ALJ's decision as a whole is supported by substantial evidence.

## III.   CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that Mohssen's Motion for Summary Judgment [11] be DENIED, the Commissioner's Motion [13] be GRANTED, and this case be AFFIRMED.

Dated: October 28, 2013                          s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                 United States Magistrate Judge

## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as

---

[7] Moreover, as the Commissioner correctly notes, it is not at all clear that a restriction to intermittent 15-minute breaks, three times a day, would significantly reduce the occupational base, as most jobs typically include two 15-minute breaks and a 30-minute lunch per day.  (Doc. #13 at 14).  *See* SSR 96-9p, 1996 WL 374185, at *6 (July 2, 1996).  In addition, the ALJ further accommodated Mohssen's difficulty with prolonged sitting and/or standing by incorporating into her RFC assessment a sit/stand option.  (Tr. 36).

provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.   *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).   The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.   *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).   Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 28, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager

21